UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

DAMARIS JACKSON                                    CIVIL ACTION

VERSUS                                             NUMBER: 07-00220

N. BURL CAIN                                       SECTION: "F"(5)

## REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. §636(b) and Local Rule 73.2E(A), presently before the Court is the 28 U.S.C. §2254 application for federal habeas corpus relief of petitioner, Damaris Jackson, the State's response thereto, and petitioner's traverse to the State's response. (Rec. docs. 1, 7, 10). Having determined that an evidentiary hearing is not necessary, it is recommended, for the reasons that follow, that Jackson's petition be dismissed with prejudice.

Petitioner Jackson is a state prisoner who is presently incarcerated at the Louisiana State Penitentiary, Angola, Louisiana. On April 12, 2002, Jackson was found guilty of one count of second degree murder and one count of attempted second degree murder after trial, by jury, in the Twenty-Fourth Judicial

District Court for the Parish of Jefferson, State of Louisiana.[1]
On May 20, 2002, Jackson was sentenced to concurrent jail terms of
life and forty-nine years at hard labor without benefit of parole,
probation, or suspension of sentence.  Jackson's conviction was
affirmed by the Louisiana Fifth Circuit Court of Appeal on April
27, 2004 but the matter was remanded to the trial court to formally
advise petitioner of the prescriptive period for seeking post-
conviction relief.  State v. Jackson, 880 So.2d 841 (La. App. 5th
Cir. 2004).  Writs were denied by the Louisiana Supreme Court on
November 8, 2004.  State v. Jackson, 885 So.2d 1118 (La. 2004).
Jackson's conviction became final ninety days later, or February 7,
2005, when the delays for seeking a writ of certiorari from the
United States Supreme Court expired and no application therefor was
made.  See U.S. Sup.Ct. R. 13(1); Roberts v. Cockrell, 319 F.3d
690, 694 (5th Cir. 2003); Ott v. Johnson, 192 F.3d 510, 513 (5th Cir.
1999), cert. denied, 529 U.S. 1099, 120 S.Ct. 1834 (2000)(citing 28
U.S.C. §2244(d)(1)(A)).

     Thereafter, on October 21, 2005, some two hundred fifty-five
days after his conviction had become final, Jackson signed a post-
conviction relief application ("PCRA") that was formally filed in
the trial court on November 3, 2005.  (St. ct. rec., vol. 2 of 6).

---

[1] Jackson and his co-defendant, Quentin Wiley (a/k/a "Heat"),
were tried together and were convicted of the same offenses.

On November 21, 2005, the trial court denied Jackson's PCRA with written reasons. (<u>Id</u>.). Writs were subsequently denied by the Louisiana Fifth Circuit on January 5, 2006, <u>State v. Jackson</u>, No. 05-KH-1022 (La. App. 5th Cir. Jan. 5, 2006)(unpublished order), and by the Louisiana Supreme Court on October 13, 2006. <u>State ex rel. Jackson v. State</u>, 939 So.2d 358 (La. 2006). Jackson signed and dated his habeas petition on December 22, 2006. (Rec. doc. 1-2, p. 29). It thus appears that Jackson has exhausted available state court remedies as required by 28 U.S.C. §2254(b)(1)(A) and that his petition was timely-filed under 28 U.S.C. §2244.

In the instant application brought pursuant to §2254, Jackson alleges that he has been denied the effective assistance of counsel both at trial and in the context of his direct criminal appeal. (Rec. doc. 1-2, pp. 13-14). While fairly lengthy, a resolution of petitioner's claims is greatly facilitated by recalling the facts surrounding the crimes in question as aptly summarized by the Louisiana Fifth Circuit, as follows:

> Kenyatta Francis testified that, on January 24, 2001, he met with Quentin Wiley (a/k/a "Heat") to discuss the sale of one and one-quarter kilograms of cocaine he (Francis) had in his possession. Wiley told Francis that he knew someone who would buy the cocaine. Francis responded that he didn't want the buyer to know he was selling drugs, and that Wiley would have to "serve" him. That evening, Francis drove a Lexus sports utility vehicle (SUV) to the home of Wiley's

girlfriend in the Woodmere Subdivision in Harvey. He was accompanied by a friend, Corey Charles, who was not involved in the planned transaction. Wiley joined the two men, and they set out to locate the buyer.

Following Wiley's directions, Francis drove to the Concordia Apartments on Westwood Drive in Marrero. Wiley exited the vehicle, carrying the cocaine in a plastic garbage bag. Wiley walked a short distance and met with a man Francis later identified as defendant, Damarais Jackson. Jackson and Wiley walked toward one of the apartment buildings and disappeared from view, while Francis and Charles waited in the SUV.

When Wiley failed to return, Francis placed a call to his cellular telephone. Francis' cellular telephone showed that the call was made at 7:11 p.m. He asked Wiley why the transaction was taking so long. Wiley told Francis that the buyer wanted to negotiate some changes in the original agreement. Francis exited the SUV, leaving Charles alone in the vehicle. Jackson approached Francis and told him he would take him to Wiley.

Francis and Jackson walked along the outside of one of the apartment buildings. At this time, Francis did not see Wiley. Francis observed that Jackson flinched nervously each time they passed a doorway. When Francis asked him where they were going, Jackson pointed a gun at him and said "Give it up." Francis attempted to reach for the gun, but Jackson fired at him. A bullet went through his shoulder and hit his face, and he fell to the ground. Francis testified that Jackson did not take anything from him after he pulled out the gun. Jackson fled on foot, running toward the truck, and Francis heard two more gunshots. Although he did not see what happened, he assumed Jackson was firing at Corey Charles. He did not, however, have

firsthand knowledge of who shot Charles. Francis did not see Wiley with a gun, and did not hear Wiley tell Jackson to shoot him.

A nearby resident called police. Francis told an officer at the scene that Heat had set him up, and that Heat's first real name was Quentin. Francis was transported to West Jefferson General Hospital, where his injuries were treated. Francis testified that he did not recover the cocaine, nor did he receive any money. Francis also testified that he identified Wiley and Jackson from a photographic lineup. On cross-examination, Francis agreed that in his initial statement to police a week after the shooting, he did not mention that Jackson had told him to "give it up."

At trial, Deputy Theodore Keelen of the Jefferson Parish Sheriff's Office testified that he went to the 1500 block of Westwood Drive in response to a shooting call. He found Corey Charles lying on the ground, bleeding and gasping for air. He asked Charles what had happened. Charles told him that he was with a guy called Keyana [sic], and then Charles responded that he could not breathe any longer. Deputy Keelen and another officer performed cardiopulmonary resuscitation, and then turned the victim over to the care of emergency technicians. Charles was eventually pronounced dead at the scene. The position of bullet casings found at the scene along with Charles' location when found by police indicated a chase had taken place.

Detective Donald Clogher testified that he interviewed Francis after the shooting, and based on information given by him, Wiley was arrested. Subsequently he obtained an arrest warrant for Jackson. Between January 30, 2001 and February 5, 2001, Clogher conducted six taped-recorded interviews with Wiley. Portions of the statements were excised as

agreed upon by attorneys, and the tape recordings were all played for the jury at trial. Transcripts of the statements were given to the jury. In the first interview, Wiley stated that he knew Kenyatta Francis, and that he knew who Corey Charles was. (In that first interview, Charles was referred to as "Corey Brown", whose nickname was "Rat".) Wiley denied having been on Westwood Drive on the night of January 24, 2001, insisting that he never goes to that area.

In his second statement taken approximately two hours later, Wiley said he went to 1500 Westwood Drive with Kenyatta Francis, who drove the Lexus truck, and Corey Charles, on January 24, 2001. He and Charles waited in the vehicle while Kenyatta went into an apartment to "holler at" someone about a "deal" he had worked out earlier. Wiley believed the deal involved a drug transaction. Francis called Wiley from his cell phone and told him to come in. Wiley continued to wait in the truck, and Francis exited the apartment some time later with two unknown men wearing hats. Francis was saying he would not give (the men) their money back, and as the men walked toward the vehicle, one of Francis' two companions shot him. Wiley did not know which of the men fired on Francis, but he saw them both holding guns. One had a silver gun, and the other a large, black semi-automatic handgun with a laser sight. Wiley jumped out of the struck and ran. Rat also jumped out. Wiley went to the Woodmere area, to the home of his girlfriend, Gretchen, and later left there in his Corvette.

Wiley made his third statement on February 1, 2001 at 11:35 a.m. This statement was substantially the same as the second, except that Wiley identified the shooter as "Marious," also known as "D". Wiley said Marious was the one who had the .9mm gun with a laser sight. He denied any involvement in a

drug transaction.

Wiley's fourth interview took place on February 1, 2001 at 2:45 p.m. Wiley stated that he arranged for Kenyatta Francis and the shooter "Demarious [sic]" whose last name is either Smith or Jackson, to meet. Damarious wanted to buy a "quarter key" (i.e., kilogram) of cocaine, and Wiley contacted Francis. Wiley accompanied Francis to the Concordia Apartments to sell a quarter key to Damarious. When they arrived at the apartment complex, Wiley sent Francis to meet with Damarious. Francis went into an apartment. When he exited the apartment, shots were fired. Wiley saw Damarious and a second, unknown man. Throughout the incident, Wiley never saw the drugs.

Wiley made a fifth statement at 3:40 p.m. on February 1, 2001. He stated that he went with Francis and Rat to meet Damarious. They were in a Lexus truck and planned to sell a quarter key of cocaine to Damarious, as arranged by Wiley. Wiley jumped out of the truck with the cocaine which was packaged in a black bag. He met with Damarious inside of an apartment and gave him the cocaine. Francis called Wiley on his cellular telephone to ask if he was alright. Wiley told Francis that Damarious was not satisfied with the quality and price of the cocaine. Francis said he wanted to see Damarious to discuss the matter. Wiley stayed in the apartment while Damarious went outside, putting a .9 mm handgun in his jacket. A short time later, Wiley heard shooting. When he left the apartment, he saw Damarious with the .9 mm, with the red laser. Another unidentified man was outside. Wiley ran to a nearby wooded area and later that night, he learned that Francis had been shot.

Wiley made a sixth and final statement on February 5, 2001 at 7:09 p.m. Wiley said Damaris Jackson told him he wanted to buy a

quarter key of cocaine. Wiley picked up
Jackson, who had a gun obtained from Wiley,
and left him at Woodmere. Jackson was to meet
him at the Concordia Apartments, and later,
Wiley went with Francis and Corey to the
Concordia, purportedly to sell cocaine to
Jackson. However, when Wiley exited the Lexus
SUV with the cocaine, he did not meet with
Jackson. Instead, he went to a Nissan Maxima
he had parked nearby, and drove it to
Woodmere. Wiley then left Woodmere in his
Corvette. He took the cocaine with him and
hid it. He did not see Jackson after the
shootings. Although he changed his story
several times during the statement, Wiley
ultimately said that he and Jackson planned a
"rip-off" before the meeting at the Concordia
Apartments.

Jackson made seven separate tape recorded
statements on February 2, 2001. He was
questioned by Detective Clogher and Detective
Meunier. All of the statements, as altered by
agreement of the attorneys, were played at
trial, and transcripts of those statements
were shown to the jurors. The first interview
began at 5:02 p.m. Jackson told Detective
Clogher that he lives with his girlfriend,
Pamela Willis, at 6565 Benedict Street in
Marrero. He spent most of the day with her,
and later in the evening went to smoke some
"weed" with his brother Jerell, a/a/a "Hoops."
After about 30 minutes, Jackson returned home.
He said he did not know Kenyatta Francis, and
that he knew Corey Charles only as a friend of
his brother's. Jackson told the detective
that he did not go to Westwood Drive on the
night of January 24, 2001, had not seen Corey
that night, and had no direct knowledge of
what had transpired.

Detective Clogher conducted a second tape
recorded interview with Jackson at 5:37 p.m.
There, Jackson said he heard a rumor that
Wiley ("Heat") was seen leaving the scene of

the shooting.  He had seen Wiley the Saturday after the incident. A week after the shooting, Wiley contacted him through his (Wiley's) girlfriend.  Wiley wanted to know whether Jackson had heard anything about the shootings.

The third interview began at 6:35 p.m. According to this account, Jackson was riding a bicycle through the Concordia Apartments complex at the time of the shootings.  He heard three shots, but he did not see the incident.  Jackson saw a black truck pulling into the last driveway.  He drove past the area later with his girlfriend, and they saw police.

Jackson's fourth interview began at 7:25 p.m. He stated that he was walking toward Westwood Drive on the night of January 24, 2001, when he saw a man who he later learned was Francis walking toward him.  Addressing someone else, Francis said, "What's up dog?"  He saw a black truck, with someone sitting inside of it. Jackson then heard gunfire, and ran.  He did not see anyone else in the area, and did not see Quentin Wiley there.

Jackson's fifth statement began at 9:14 p.m. He said he was in Concordia Apartments complex looking for his girlfriend's car, as she had allowed a man to borrow it.  He saw Heat (Wiley), who said he had business in the area. Wiley asked Jackson to go around the corner and let Francis know that Wiley was there. Jackson went to give Francis the message from Wiley, and as he approached Francis, his (Jackson's) pants started to slide down. Jackson grabbed the gun that was tucked into his pants and started to put it in his jacket pocket.  Francis tired to grab the gun, and it went off.  Jackson shot Francis two to three times. Jackson then fled on foot.  He saw someone jump out of Francis' truck and move toward him.  Thinking that person had a gun,

9

Jackson fired on hm.  Jackson stated that his gun is a .40 mm, and that it has a laser sight.  He ran home and asked his girlfriend to take him to St. Thomas Housing Project in New Orleans, where he sold his gun.

A sixth interview began at 10:04 p.m. Jackson said that, on January 24, 2001, Heat told him that he and Francis had some cocaine they were going to sell.  Wiley told Jackson to meet him at the Concordia Apartments, and he would get a share of the cocaine.  Jackson brought his gun to protect himself.  When the two met that night, Wiley asked Jackson to go to Francis' truck and bring Francis to him.  Jackson and Francis were walking together, and Francis flinched or jumped.  In response, Jackson pulled out his gun and shot Francis.  Corey Charles ran from Francis' truck, taking Jackson by surprise.  Thinking Charles might have a gun, Jackson fired at him.  Jackson did not see Wiley after the incident, and in this statement, declared that he sold his gun for two bags of heroin.

The seventh and final interview began at 10:54 p.m. Jackson stated that Wiley came to his house on January 23, 2001.  Wiley told him that he had a "little hustle" and offered Jackson six thousand dollars worth of cocaine to kill Francis.  Jackson said he has a bad heroin habit, and Wiley knew he spent any money he got on the drug.  Wiley used this to manipulate him.

On the morning of January 24, 2001, Wiley brought Jackson a gun, and brought him to Concordia earlier in the evening. Jackson then left in this girlfriend's car, and met Wiley at the Concordia Apartments later that evening. Wiley was carrying a bag.  Wiley told Jackson to "go call that n----r for me." Jackson found Francis and told him to accompany him to where Wiley was.  The plan called for Jackson to take Francis in back of

a building and kill him.

As Jackson led Francis to the appointed spot,
he tried to pull the gun from his jacket
pocket, and found it was stuck.  Francis saw
this, and became jumpy.  Thinking that Francis
might have a gun, Jackson fired his gun, shot
Francis twice, and fled on foot.  He saw
someone in the truck and when Charles opened
the door, Jackson shot him.  Charles tried to
run from Francis' vehicle as Jackson fired ten
shots at him.  Wiley saw Jackson running, and
picked him up in a car and took him to his
(Jackson's) girlfriend's house.  Wiley gave
him one hundred dollars that night.  Jackson
saw Wiley days later, at which time Wiley gave
him an additional five hundred dollars. Wiley
told Jackson he (Wiley) was wanted by the
authorities, and that he planned to turn
himself in.

Detective Clogher testified that the search of
a residence where Jackson had been disclosed
.9, .22, .25 and .32 caliber ammunition, but
no .40 caliber rounds were found.  No
information was developed during the
investigation to indicate that Wiley shot or
robbed either Corey Charles or Francis, and
neither the cocaine nor the gun used in the
shooting was ever located.

Dr. Susan Garcia, an expert in forensic
pathology, testified that she conducted an
autopsy on the body of Corey Charles.  She
identified four bullet entrance wounds.  Two
of those wounds had corresponding exit wounds.
As to the other two, the doctor recovered
projectiles from the body. Two bullets entered
from the back, and two from the right side.
Three of the wounds were not lethal.  The
fourth bullet injured the victim's kidney,
liver, and right lung.  Dr. Garcia testified
that organs bleed at a high rate.  The liver
is particularly vascular, and bleeds profusely
when injured.  It was the doctor's opinion

that the victim bled to death. Dr. Garcia
identified State's Exhibits 26 and 27 as the
projectiles she removed from Corey Charles'
body.

Louise Walzer, an expert in firearms
identification and ballistics, examined the
spent cartridge casings recovered from the
scene and identified them as .40 caliber Speer
casings. Walzer also examined State's Exhibits
26 and 27, the bullets recovered from the
victim's body. She found that they were also
.40 caliber. She testified that all of those
items were consistent with being fired from a
40 caliber class weapon, and all of the fired
cartridge casings came from the same weapon.

Detective Donald Meunier testified that he
collected the evidence recovered from the
crime scene, which included several .40
caliber cartridge casings. Investigating
officers executed several search warrants in
connection with the investigation. However,
no gun was ever recovered. Among the items
recovered in a search of 4232 Lac Couture
Drive, Apartment C in Harvey, where defendant
was believed to be staying, were numerous live
.9 mm cartridges, as well as .22, .25 and .32
caliber cartridges.

Jackson's fiancee', Pamela Willis, testified
on his behalf. She stated she was with Jackson
during the entire day on January 24, 2001.
She did not know of any conversation he may
have had with Wiley. He used heroin on a
daily basis, and that night he used heroin
starting at around 6:00 p.m. He left her house
that evening in her car. On the morning prior
to his arrest, he smoked marijuana.

Jackson, 880 So.2d
at 844-48.

Jackson's first claim for relief is that he was denied the

effective assistance of trial counsel in several respects.  First,
Jackson alleges that counsel failed to adequately cross-examine
Detective Clogher at the pre-trial hearing on petitioner's motion
to suppress and additionally failed to call petitioner to testify
at said hearing. Second, Jackson contends that counsel failed to
investigate, interview, and subpoena Danielle Frazier to testify.
Third, petitioner alleges that counsel was deficient for failing to
adequately cross-examine Kenyatta Francis.  And fourth, Jackson
argues that counsel was ineffective for initially presenting an
insanity defense which he ultimately abandoned.  In his second
claim for relief, Jackson alleges that his appellate counsel was
ineffective for failing to file a supplement brief that included
<u>Crawford v. Washington</u>, 541 U.S. 36, 124 S.Ct. 1354 (2004), a case
that was decided while petitioner's case was pending before the
Louisiana Fifth Circuit Court of Appeal.

   Jackson alleges that he was denied the effective assistance of
trial and appellate counsel as guaranteed by the Sixth Amendment.
To merit relief on a claim of ineffective assistance of counsel, a
habeas petitioner must satisfy the two-pronged test articulated by
the Supreme Court in <u>Strickland v. Washington</u>, 466 U.S. 668, 687,
104 S.Ct. 2052, 2064 (1984), by demonstrating that: (1) counsel's
performance was deficient and (2) that the deficient performance
prejudiced the defense.  The burden of proving either element of

Strickland is a heavy one and if proof of one element is lacking, the Court need not consider the other. Id. at 697, 104 S.Ct. 2069. Morever, "[i]f the facts adduced at trial point so overwhelmingly to the defendant's guilt that even the most competent attorney would be unlikely to have obtained an acquittal, then the defendant's ineffective assistance claim must fail." Green v. Lynaugh, 868 F.2d 176, 177 (5th Cir.), cert. denied, 493 U.S. 831, 110 S.Ct. 102 (1989). In evaluating allegations of ineffectiveness, the Court must be mindful of the strong presumption that counsel's actions or inactions were part of a sound trial strategy. Murray v. Maggio, 736 F.2d 279, 282 (5th Cir. 1984); Boyd v. Estelle, 661 F.2d 388, 390 (5th Cir. 1981).

In his first two related specifications of alleged ineffectiveness, Jackson claims that counsel failed to adequately cross-examine Detective Clogher at the pre-trial hearing on his motion to suppress and also failed to call petitioner to testify at that hearing. Jackson asserts that during his fourth, fifth, and sixth statements to police he "clearly indicated" that he was scared but that neither of the detectives questioned him as to the reasons for his fright. This, so argues Jackson, was a conscious omission on the detectives' part to avoid having petitioner state that he was afraid of them. Jackson contends that had his counsel effectively cross-examined Detective Clogher about the detectives'

14

alleged failure to inquire, and to call petitioner to testify to threats of future harm made by the detectives, Clogher's testimony on the free and voluntary nature of Jackson's statements would have been seriously undermined.

At the motion to suppress hearing that was held on July 17, 2001, Detective Clogher testified to the mechanics of the interviews he had conducted of Jackson and his co-defendant subsequent to their arrests. As respects Jackson, the detective first explained the customary <u>Miranda</u>[2]/ warnings that appeared on the "Rights of Arrestee" form used by law enforcement and asked Jackson to initial and sign the form acknowledging his understanding of those rights. Over the next six hours, Jackson gave a total of seven separate statements, each time being reminded of his constitutional rights beforehand. Clogher testified that at no time was Jackson forced or coerced to give a statement nor was he offered or promised anything to induce him to do so. (St. ct. rec., vol. 3 of 6, trans. at p. 91). Relevant to the issues at hand, Jackson's counsel posed the following questions to Clogher on cross-examination:

> Q. Okay. At the time that he was arrested, did you notice whether or not he was under the influence of drugs or alcohol at the time?

---

[2]/ <u>Miranda v. Arizona</u>, 384 U.S. 436, 86 S.Ct. 1602 (1966).

A. No, I did not.

Q. You did not. Okay. You got him back to the Detective Bureau at 4:45, according to Exhibit 10, he signed the Rights of Arrestee Form; is that correct? I think that's Exhibit Number 10 that you have?

A. Yes.

Q. Okay. At that time, what was his demeanor?

A. Normal demeanor.

Q. Meaning what? He wasn't scared or anything like that that you could see? Did he stutter, was he forthcoming in your discussions or how did things go?

A. He was - - I mean he was a normal demeanor. I mean he was not quite forthcoming, but he was talkative.

* * * * * * * * * * * *

Q. Did he at any time indicate that he wanted the assistance of an attorney or [to] talk to somebody else before he went forward?

A. No, sir.

Q. Over this six hour period, was this a continuing interview? Was there any stopping or anything along the lines? Or was this just six hours of interrogation?

A. This was just - - it was an ongoing interview. I'm sure there were stoppages at some point. There were brief stoppages, but it was an ongoing interview?

Q. So, it was a continuing interview for the most part, right?

A. Correct.

Q. Did Mr. Jackson, during the time of this interview, have the opportunity to have anything to eat?

A. Yes, he did.

Q. He did. Did he get an opportunity just to pause and rest
and reflect before he went on to anything else?

A. Yes, he did.

Q. Did he get the opportunity to use the restroom facilities
during this period of time?

A. Yes, he did.

Q. Was anyone else present sent the interviews were taken?

A. Yes.

Q. Who were they?

A. Detective Donald Meunier.

Q. And that's all? That's the only person?

A. Yes.

MR. SOIGNET:

One second, Your Honor, let me just ask my client.

* * * * * * * * * * * *

Q. One other question, Officer. During your interview prior
to filling out the rights form and finding out that Mr.
Jackson had a ninth grade education, did he indicate to
you that he had a history of mental illness at that time?

A. No, he did not.

Q. He did not.

(St. ct. rec., vol. 3 of 6,
trans. at pp. 101-102, 104-
106).

After considering the testimony of Clogher and another

detective, the trial judge denied Jackson's motion to suppress.

17

(St. ct. rec., vol. 3 of 6, trans. at p. 112).

At trial, Detective Clogher was again called as a prosecution witness and again he testified to the circumstances surrounding the seven statements Jackson gave to the police. Transcribed copies of the statements were provided to the jurors and the audiotapes of the statements was played in open court as well. In this third statement to authorities, the following exchanges occurred:

> Q. Okay. Is there anything else you can remember about that night that you want to add to this statement?
>
> A. No, sir.
>
> Q. Okay. Initially you stated that you weren't actually on Westwood.
>
> A. Yes, sir.
>
> Q. What was - -
>
> A. I was scared.
>
> Q. You were scared?
>
> A. Yeah.
>
> Q. Okay. What were you scared of?
>
> A. For my life, for, you know, just scared. You know, I'm young, you know what I'm saying. Just scared of everything, bra.
>
> Q. Okay.
>
> A. Lot of stuff done happened to me in my life, bra, you know what I'm saying.
>
> Q. Okay. Is everything in this statement true and correct to the best of your knowledge?

A.   Yes, sir.

Q.   Okay.  That will conclude this statement.  The time is now approximately 6:45 PM, same date.

(St. ct. rec., vol. 4 of 6, trans. at p. 381).

Jackson's fourth statement to police contained the following:

Q.   Okay.  In reference to the incident that occurred at 1500 Westwood that we have been talking about, okay. You were talking about the incident as it occurred; is that correct?  Do you remember something happening?

A.   Yeah.

Q.   Okay.  Can you tell me exactly what happened that night which is Wednesday the 24th at the Concordia Apartments?

A.   Well, I told y'all earlier, you know what I'm saying, I'm scared.  I'm still scared, bra.

Q.   Okay.

A.   But I was riding on a bike and I passed it up and all this, but I was coming, walking, me and my girl had got into it and shit.  So I'm walking about my business, you know what I'm saying.

(St. ct. rec., vol. 4 of 6, trans. at pp. 384-385).

The following exchange occurred in the context of Jackson's fifth statement to the police:

Q.   Okay.  What happened, I guess, after the incident with the truck?  You said you were running past the truck and the guy got out, okay.  And after you shot at that time, what happened next?

19

A.    I ran.

Q.    Where did you run?

A.    I ran going home.

Q.    Okay.  And is that back where you went?

A.    (Inaudible) Yeah.

Q.    You went home?

A.    No response herd [sic].

Q.    And home is where, again?

A.    6565 Benedict.

Q.    Okay.  And what did you do when you got home?

A.    I got home.  I was you know, shooken up cause, you know,
      this is the first time something like that happened.  I
      ain't never - - I was real shooken up.

Q.    Okay.

A.    I was scared like I am now scared.  Scared.

Q.    (Det. D. Meunier) What did you do with the gun when you
      got home?

A.    I kept it in my pocket.  I took the gun across the river
      with me.  That night, I had got my girlfriend to bring me
      across the river, dig.  I didn't sell it that night.  The
      next day I sold it in the project, in the St. Thomas
      Project, for forty dollars to some little dude I don't
      know.

Q.    (Det. D. Meunier) You were by yourself when you did that?

A.    Yes, sir.

Q.    Okay.  So, after that happened being that Heat was
      involved, did you have anymore contact with Heat after
      that?

A.   I seen him, like I said, that Saturday.  And me and him talked for a minute, you know, and that was it.

Q.   (Det. D. Meunier) Did you look him up over at his girlfriend's house on Alex Korman?  Did you go over there?

A.   No, I didn't sir.

Q.   (Det. D. Meunier) But you did speak to him by phone?

A.   Yes, sir.

Q.   (Det. D. Meunier) that was all true about her coming to pick you up?

A.   Yes, sir.

Q.   (Det. D. Meunier) and bring you back to ah -

A.   Yes, sir.

Q.   (Det. D. Meunier) Bringing you back to the number where Heat would call?

A.   Yes, sir.

Q.   (Det. D. Meunier) That was when he was in jail right?

A.   Yes, sir.

Q.   (Det. D. Meunier) Okay.  What did you and Heat talk about?

A.   He was asking me, you know, about what happened that night and this and that.  But you know, I was kind of, you know, scared.  I was scared to talk to him on the phone.  So, there wasn't too much to talk about.

Q.   (Det. D. Meunier) Okay.  Is this statement true?

A.   Yes, sir.

Q.   (Det. D. Meunier) Completely true?

A.   Yes, sir.

Q.   (Det. D. Meunier) Anything you want to add?

A.   I'm scared. I'm scared.

Q.   (Det. D. Meunier) Okay.  Statement's going to conclude at approximately 9:25 PM, same date.

> (St. ct. rec., vol. 4 of 6, trans. at pp. 404-406).

Jackson's sixth statement to police, given at 10:04 p.m. on February 2, 2001, included the following:

Q.   Do you know if he got in the rental car or anything? Did he know about the rental car?

A.   No, he didn't.

Q.   Okay.  So he wouldn't have known how you got there.

A.   No response heard.

Q.   Okay.

Q.   (Det. D. Meunier) Damaris, why didn't you tell us this earlier?

A.   Cause I was scared and confused and, you know, just scared.

Q.   (Det. D. Meunier) All right.

A.   Scared for my life and (inaudible).

Q.   (Det. D. Meunier) Okay.

A.   I'm scared if I walk out of here, you know, be back on the streets, something might happen to me out there.  I don't know really - - I don't know, you know what I'm saying.  I really don't know, I just (inaudible).

22

Q.   (Det. D. Meunier) What did you do with the gun.

A.   I sold it.

* * * * * * * * * * * *

Q.   (Det. D. Meunier) Did you ever go back and get the car?

A.   No.

Q.   (Det. D. Meunier) Okay.  Do you know if it's still there.

A.   I don't know.

Q.   (Det. D. Meunier) All right.  Damaris, do you feel like you've been treated fairly?  Have we been fair with you today?

A.   Yes, y'all have.

Q.   (Det. D. Meunier) Okay.

A.   I thank y'all for that, letting me get a peace of mind.

Q.   (Det. D. Meunier) All right.

A.   I thank y'all for counseling me cause I needed it.

Q.   (Det. D. Meunier) All right.  Is there anything you want to add?

A.   I'm sorry about what happened. I wish I could change it, but I can't.

Q.   (Det. D. Meunier) Okay.

A.   Just, I just - - I said me and Corey, wrong place, wrong time, wrong people to be dealing with and now we see it. It's too late for both of us.  Sorry for it to go down like that.  Like I said, Corey was my brother's best friend, if I would have known, you know, that it wouldn't of even went down like that.

Q.   (Det. D. Meunier) All right.  Statement is going to

conclude at 10:29 PM, same date.

(St. ct. rec., vol. 4 of 6, trans. at pp. 418-419, 424-425).

Finally, in his seventh statement to police Jackson provided the following answers to the questions asked of him:

Q.   (Det. D. Meunier) Damaris, let me ask you are you, are you still aware you retain all your rights?

A.   Yes, sir.

Q.   (Det. D. Meunier) of Miranda?

A.   Yes, sir.

Q.   (Det. D. Meunier) All the rights that were originally read to you, the rights we have referred to before we took each, each subsequent taped statement from you?

A.   Yes, sir.

Q.   (Det. D. Meunier) Other than when you asked to go to the bathroom and you did ask to do that an awful lot, other than we take you to the bathroom, ah, where have you been once we ah, once we arrested you and brought you into the investigations bureau?

A.   This room.

Q.   (Det. D. Meunier) This room, okay, we call this an interview room.  This is the room you have been in?

A.   Yes, sir.

Q.   (Det. D. Meunier) Okay.  Ah, with the exception of the bathroom and ah, when, when you asked if you could ah, call your dad; is that correct?

A.   Yes, sir.

Q.   (Det. D. Meunier) Okay.  After you called your dad, and

that was a few minutes ago, you came back in this room;
is that true?

A.    Yes, sir.


Q.    (Det. D. Meunier) Okay, and, and we left you alone for a
few minutes, is that true?

A.    Yes, sir.

Q.    (Det. D. Meunier) Okay. Did you ask us to come back in?

A.    Yes, sir.

Q.    (Det. D. Meunier) And bring the tape recorder with us?

A.    Yes, I did.

Q.    (Det. D. Meunier) Okay.  Why did you do that?

A.    Because I just talked to my dad and my grandmas and all
of them, and they was just telling me to be - - to tell
y'all the truth and what all happen and you know.  So,
you know, I'm being straight up with y'all.  They told
me, you know, the charges I got and all that.  I might as
well turn my life over to the Lord.  So, I am just going
to be straight from this point on, you know what I'm
saying.  Stop beating around the bush and be honest with
you guys, you know what I'm saying.  This what happened,
you dig.  The day before, Heat came and holler at me, you
dig.  He was letting me know.  He was like "Man I got
this little hustle, you dig."  I'm like yeah, you know
what I'm saying.  At first I was, you know, I was feeling
him.  I was like yeah, like yeah, dog, easy, you dig.
All you got to do is spank this n____r and this n____r,
spank this dude you heard me.  Kill this dude was
Kenyata, you know what I'm saying.  He told me to kill
Kenyata.

Q.    (Det. D. Meunier) He told you to kill Kenyata?

A.    Yes, he did.

Q.    (Det. D. Meunier) Did he tell you why?

25

A.   It was over the drugs.

Q.   (Det. D. Meunier) All right.  Go on.


        * * * * * * * * * * * *


Q.   (Det. D. Meunier) All right.  Walking on the sidewalk?

A.   Yeah, we was walking on the sidewalk.  So, when we turned
     the corner on the other sidewalk, on the other sidewalk
     it was like - - he was like, "You gonna do it, bra, you
     gonna do it."  I was like, Man, I don't - - I ain't - -
     I was like yeah at first I'm gonna do it, I'm gonna do
     it.   But I was determined in my heart, you heard me, I
     was like I can't do this man.  I'm too scared to do this.
     I got to think about the consequences.  And from walking
     with Kenyata he told me man go get Kenyata, go call him,
     you heard me, go call him.

        * * * * * * * * * * * *


A.   The way he jumped out the truck, you know.  Like I said,
     when I first ran past the truck, when I got in front the
     truck, right in front the truck, the headlights was on
     me, you know.  And I looked and that's what made me look
     in the truck when I first shot Kenyata.  It didn't occur
     to me, you know that he was in the truck watching the
     whole thing go down you know.  So, when I did it pow-pow,
     you know, I was gone right then.  When I got in front the
     truck, like I said, the headlights was on me, and he was
     sitting in the truck and I couldn't see what he was
     doing, you know.  I couldn't see if he was getting a gun
     or what you know. Just whatever he was doing and that
     scared me even more you know, cause like I said that
     could have been me.  So I just shot.

        * * * * * * * * * * * *


Q.   (Det. D. Meunier) Damaris, why, why are you still
     shooting at Corey if he is running away at that point?
     you said he's running toward Lapalco.

A.   Yes, sir.

Q.   (Det. D. Meunier) Why are you still shooting at him?

A.   To be honest with you, I don't know.  I was scared.  I was confused.  I was all kind of stuff at that time.

* * * * * * * * * * * *

Q.   (Det. D. Meunier) Were there any bullets left in the gun?

A.   I don't know.  I didn't even - - I didn't check the gun or nothing, when I got to the - - to my house I just like was real paranoid and, you know, shaken up.  I got my girlfriend to bring me across the river so I could get me some heroin.  After I got that, you know, it cooled me down a lot.

(St. ct. rec., vol. 4 of 6, trans. at pp. 426-428, 432, 434-437).

Contrary to Jackson's present assertions, a fair reading of the testimony and statement excerpts set forth above readily demonstrates that petitioner's apprehension was not directed to his interrogators but was related to his alleged fear at the time of the shooting, fear of talking with his co-defendant about the incident via telephone, and fear of retaliation from associates of the victims.  In fact, by the time he gave his seventh and final statement to police, Jackson was thankful for the treatment the authorities had shown him.  While Jackson's interview may have spanned almost six hours, testimony demonstrated that he was provided with various opportunities to eat, rest, reflect, use the restroom, and talk with relatives over the phone.  Unlike the

Court, whose review here is limited to a paper transcript, the jurors also heard audiotape recordings of Jackson's statements, thus putting them in a far better position to assess whether a coercive atmosphere was present and whether the statements were freely and voluntarily given. The Court agrees with the State that Jackson's statements themselves provide ample evidence of the voluntariness with which they were given. In light of such overwhelming evidence, there is no reasonable probability that counsel could have secured the suppression of the statements but for his failure to cross-examine Detective Clogher more fully or to call Jackson to testify at the suppression hearing.

In his next specification of ineffectiveness, Jackson alleges that counsel failed to investigate, interview, and subpoena one Danielle Frazier to testify at trial. Had counsel done so, petitioner argues, Frazier could have testified that the person she saw running after she heard gunshots had a "low fade" haircut which supposedly conflicts with a January 31, 2001 statement from Kenyatta Francis that the person had a dreadlock hairstyle with a sock hat on his head.

Complaints of uncalled witnesses, in an effort to demonstrate ineffective assistance of counsel, are generally disfavored in federal habeas proceedings. Murray, 736 F.2d at 282. This is so because "... the presentation of testimonial evidence is a matter

of trial strategy and because allegations of what a witness [would] testif[y] [to] are largely speculative." Boyd v. Estelle, 661 F.2d 388, 390 (5th Cir. 1981)(quoting Buckelew v. United States, 575 F.2d 515, 521 (5th Cir. 1978)).  A habeas petitioner must thus overcome the strong presumption that his counsel's decision in not calling a witness was a strategic one, Murray, 736 F.2d at 282, and he must ultimately demonstrate that the witness was both available and would have testified favorably in his case.  Gomez v. McKaskle, 734 F.2d 1007, 1109-10 (5th Cir.), cert. denied, 469 U.S. 1041, 105 S.Ct. 524 (1984); Boyd, 661 F.2d at 390.

The Court has reviewed the statements taken from Danielle Frazier on January 24, 2001 and from Kenyatta Francis on January 31, 2001, both of which are appended to Jackson's petition.  (Rec. doc. 1-3, pp. 1-19, 25-30).  Having done so, it is readily apparent that the statements differ in one critical respect - Frazier did not see the actual shooting and only viewed part of the crime scene through her window after hearing gunshots whereas Francis observed Jackson from only several feet before being shot by him.  The description that Francis gave in his statement was essentially the same as the one that he testified to at trial with Jackson being described as a tall individual with dreadlocks and a sock cap. Francis also testified to identifying Jackson as the shooter in a photographic showing conducted after the incident and he proceeded

to do so again in open court.  (St. ct. rec., vol. 3 of 6, pp. 180-254).  The detailed statements that Jackson voluntarily provided to police also provided overwhelming evidence of his guilt. For his part, counsel did an admirable job, during cross-examination, in getting Francis to admit that his desire to distribute drugs was the catalyst of the incident and that petitioner had not taken anything from him during the crimes.  A suggested theory of self-defense was apparently rejected by the jury.  Here, Jackson has established neither Frazier's availability to testifying nor has he made any showing that she would have testified favorably in his case.  No Sixth Amendment violation is apparent.

Next, Jackson complains that counsel was ineffective for electing to proceed with insanity and intoxication defenses at trial, ultimately abandoning the former as the proceeding unfolded. Jackson argues that once his psychiatric expert, Dr. Sara Deland, determined that petitioner was able to distinguish right from wrong at the time of the shooting, his plea should have been formally changed back to not guilty and that the abandonment of the insanity defense somehow precluded the jury from considering the proffered intoxication defense.

Jackson was arraigned on March 13, 2001 and entered a plea of not guilty.  (St. ct. rec., vol. 1 of 6).  Approximately two months later, Jackson's counsel moved to amend the plea to not guilty and

not guilty by reason of insanity which motion was granted on June 19, 2001. (Id.). On July 23, 2001, the trial court ordered that Dr. Deland be allowed contact visitation with petitioner to assist in the preparation of his defense. (Id.). On March 5, 2002, the trial court also allowed Jackson to have contact visitation with Dr. Fred Sautter, a psychologist, as the trial date grew nearer. (Id.).

At trial, Jackson called his girlfriend to the stand who testified that petitioner used heroin at 6:00 p.m. and left her apartment at 7:00 p.m. on the night of the shooting. (St. ct. rec., vol. 5 of 6, pp. 604-605). By this time, the State had been made aware of the substance of Dr. Deland's intended testimony. Out of the jury's presence, the prosecution strenuously objected to the use of such testimony in an attempt to prove up an intoxication defense because the doctor was neither a fact witness nor a toxicologist. (Id. at pp. 622-627). Ultimately, the trial judge ruled that she was unable to anticipate the precise testimony the doctor would give so she denied the State's motion in limine, reserving to it the right to object as the testimony was given. (Id. at p. 627).

Dr. Deland took the stand, was questioned by both sides, and was qualified as an expert in the field of forensic psychiatry. (St. ct. rec., vol. 5 of 6, pp. 628-635). Based on her examination

of petitioner and a review of various records, Dr. Deland opined that Jackson suffered from post-traumatic stress disorder ("PTSD"), polysubstance dependence, and borderline intellectual functioning. Although the doctor did not believe there was sufficient evidence to conclude that petitioner was unable to distinguish right from wrong at the time of the offenses, she did testify that PTSD "...is manifested by mood swings, irritability, jumpiness, [and] sort of a constant low level sort of paranoid type of stance...and their mood gets harder and harder to control." (Id. at pp. 37-38). Dr. Deland further testified that individuals suffering from PTSD "...may jump to the conclusion that something is a threat that most of us would not necessarily think was a threat." (Id. at p. 641). In the doctor's opinion, the perceptions and reasoning processes of chronic heroin users were diminished as compared with those of individuals who were drug-free. (Id. at pp. 650-651).

In closing arguments to the jury, Jackson's counsel explained the need for retaining a psychiatric expert to opine on the extent and effect of petitioner's mental illness and the procedural necessity of entering an insanity plea for that purpose. Although the plea was not frivolous when it was originally entered, counsel acknowledged that it could not be maintained based on Dr. Deland's testimony. In light of Francis' testimony and petitioner's voluntary statements to police in which he admitted to shooting the victims, counsel conceded that point as well. Relying on Dr.

Deland's testimony, however, counsel argued that Jackson's mental state precluded him from forming the requisite specific intent or, alternatively, reasonably caused him to believe that the shooting was a necessary act of self-defense. (St. ct. rec., vol. 5 of 6, pp. 703-712). Prior to deliberating, the jury was instructed to acquit Jackson if they believed that his voluntary intoxication or drugged state prevented him from forming specific criminal intent. (Id. at p. 743). Unfortunately for Jackson, the jury deliberated for all of one hour and forty-five minutes before returning guilty verdicts as to himself and his co-defendant.

Having reviewed the record in its entirety, it is apparent that the defensive options available to Jackson's counsel were extremely limited, particularly in light of petitioner's voluntary statements in which he admitted to the shootings. Under Article 651 of the Louisiana Code of Criminal Procedure, "[w]hen a defendant is tried upon a plea of 'not guilty', evidence of insanity or mental defect at the time of the offense shall not be admissible." Faced with that prohibition, counsel had no choice but to enter the insanity plea when he did to allow him to put on evidence of Jackson's mental state at trial. Given the facts that were before him, the Court is unable to say that counsel's obvious strategic choice was an unreasonable one. The mere fact that the strategy ultimately proved to be unavailing does not, in and of itself, compel the conclusion that a Sixth Amendment violation

occurred.  See, e.g., Johnson v. Dretke, 394 F.3d 332, 337-38 (5th

Cir. 2004), cert. denied, ___ U.S. _____, 127 S.Ct. 383 (2006);

Ward v. Whitley, 21 F.3d 1355, 1361 (5th Cir. 1994), cert. denied,

513 U.S. 1192, 115 S.Ct. 1257 (1995).

Similar to the earlier allegations that counsel was
ineffective for failing to call Danielle Frazier to testify,
petitioner additionally faults counsel for failing to adequately
cross-examine Kenyatta Francis about his identification of Jackson.
Here, again, identification was not a significant issue at trial
inasmuch as petitioner confessed to shooting both of the victims.
Jackson also complains of counsel's failure to put on evidence
showing the amount of alcohol that Charles had in his system.
There was no need for counsel to present such cumulative evidence
as Dr. Susan Garcia, the pathologist, had already testified that
there were non-detectable levels of alcohol in the victim's system.
(St. ct. rec., vol. 4 of 6, pp. 272-273).  While Francis may have
indicated in his first statement to police that a twelve pack of
beer was brought to the apartment of Wiley's girlfriend prior to
the shooting, there was no evidence that any of it was consumed by
anyone.  More importantly, whether alcohol consumption may have
effected Francis' ability to identify Jackson as the assailant was
of little value to petitioner because he openly admitted to
shooting Francis in three of his seven statements.  Common to all
of Jackson's specifications of alleged ineffectiveness of trial

counsel is that they fail, either singly or in combination, to cast doubt on the overwhelming evidence of petitioner's guilt as established by his and his co-defendant's statements to police and the testimony of Kenyatta Francis. <u>Green</u>, 868 F.2d at 177. Jackson's first claim is without merit.

In his second claim for federal habeas corpus relief, Jackson alleges that appellate counsel was ineffective for failing to supplement his direct criminal appeal with the Supreme Court's decision in <u>Crawford v. Washington</u>, 541 U.S. 36, 124 S.Ct. 1354 (2004). According to the respondent, Jackson's counsel filed his appellate brief on December 22, 2003. (Rec. doc. 7, p. 32, n. 13). The Supreme Court decided <u>Crawford</u> on March 8, 2004 and the Louisiana Fifth Circuit Court of Appeal affirmed Jackson's conviction on April 27, 2004. <u>Jackson</u>, 880 So.2d 841.

Prior to trial, Jackson and his co-defendant moved to sever the joint trial then scheduled against them, arguing that the admission of their statements to police and their expected invocation of the Fifth Amendment would deny them their confrontation rights. Those motions were argued to the trial court and were denied on April 9, 2002. (St. ct. rec., vol. 3 of 6, trans. of Apr. 8, 2002 and of Apr. 9, 2002, pp. 161-164). As expected, after the co-defendants' statements were admitted during the State's case-in-chief, they each moved to call the other to the stand and both asserted their Fifth Amendment rights. (St. ct.

rec., vol. 5 of 6, pp. 615-622).  The two defendants then moved for a mistrial and  both motions were denied.  (_Id_.).

On direct appeal, Jackson argued that the trial court erred in failing to grant a severance, in allowing Wiley's statements into evidence, and in failing to grant a mistrial.  <u>Jackson</u>, 880 So.2d at 851.  In disposing of that claim, the Louisiana Fifth Circuit ruled as follows:

> Confrontation errors are subject to a harmless error analysis.  Pretermitting a full discussion on the admissibility of Wiley's statements, we find that whether or not the admission of such was error, any possible error was harmless.
>
> The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts.  These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.
>
> Here, Wiley's statements were not necessary to the state's case.  In light of the overwhelming evidence submitted by the state, including Jackson's own confession, we find the guilty verdict was surely unattributable to any possible error.  Further, the defenses are not mutually antagonistic, as Jackson neither attempted to implicate Wiley as the shooter nor deny his own actions.  Under these circumstances, a severance was not required, and there was no basis for a mistrial.  This assignment of error is without merit.
>
> <u>Jackson</u>, 880 So.2d at 853
> (footnotes  omitted).

Following the affirmance of his conviction by the Louisiana Fifth Circuit, Jackson filed a <u>pro</u> <u>se</u> writ application to the Louisiana Supreme Court which included argument based on the <u>Crawford</u> decision. (St. ct. rec., vol. 6 of 6). That writ application was denied without written reasons. <u>Jackson</u>, 885 So.2d 1118.

The State is correct that Confrontation Clause violations are subject to the harmless error analysis. <u>Horn v. Quarterman</u>, 508 F.3d 306, 322 n. 24 (5th Cir. 2007), <u>cert</u>. <u>denied</u>, ___ U.S. ___, 128 S.Ct. 2084 (2008). The United States Court of Appeals for the Fifth Circuit has held that in cases governed by the AEDPA, federal habeas courts should continue to analyze the harmlessness of all state court decisions involving a constitutional "trial" error according to the standard articulated by the Supreme Court in <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 113 S.Ct. 1710 (1993). <u>Robertson v. Cain</u>, 324 F.3d 297, 304-07 (5th Cir. 2003). Under <u>Brecht</u>, a federal court may grant habeas relief only if it determines that the constitutional error had a "... substantial and injurious effect or influence in determining the jury's verdict." <u>Brecht</u>, 507 U.S. at 623, 113 S.Ct. at 1714 (quoting <u>Kotteakos v. United States</u>, 328 U.S. 750, 776, 66 S.Ct. 1239, 1253 (1946)).

Claims of ineffective assistance of appellate counsel are evaluated under the traditional <u>Strickland</u> standard. <u>Blanton v.</u>

<u>Quarterman</u>, 543 F.3d 230, 240 (5th Cir. 2008). Here, Jackson alleges that counsel was ineffective for failing to supplement her direct appellate brief with the Supreme Court's decision in <u>Crawford</u>. Inasmuch as Jackson did include <u>Crawford</u> in his subsequent <u>pro</u> <u>se</u> writ application to the Louisiana Supreme Court and his conviction was left undisturbed, the Court is unable to say that Jackson was prejudiced by the omission of which he complains because the result of his direct appeal would have been no different. Moreover, as was noted earlier in the resolution of Jackson's claim of ineffective assistance of trial counsel, in light of the overwhelming evidence of his guilt, any Confrontation Clause error was harmless under <u>Brecht</u>. A lack of prejudice flowing from a trial error forecloses any finding of prejudice from an appellate error predicated on the same issue. <u>Garcia v. Quarterman</u>, 454 F.3d 441, 449-50 (5th Cir. 2006). The state court's rejection of Jackson's ineffectiveness claims was neither contrary to nor an unreasonable application of federal law.

<b><u>RECOMMENDATION</u></b>

For the foregoing reasons, it is recommended that the application for federal habeas corpus relief of Damaris Jackson be dismissed with prejudice.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within 10 days after being served

with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. <u>Douglass v. United Services Auto. Assoc.</u>, 79 F.3d 1415 (5th Cir. 1996)(<u>en</u> <u>banc</u>).

New Orleans, Louisiana, this <u>27th</u> day of <u>February</u>, 2009.

*Alma L. Chasez*

ALMA L. CHASEZ
UNITED STATES MAGISTRATE JUDGE